543 S.E.2d 313

**John TAYLOR, et al., Plaintiffs Below, Appellees,**

v.

**MUTUAL MINING, INC., Defendant Below,**

**and**

**Island Creek Coal Company, Island Creek Corporation, Consol, Inc., and Laurel Run Mining Company, Defendants Below, Appellants.**

No. 27781.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 28, 2000.

Decided Dec. 11, 2000.

Dissenting Opinion of Justice Starcher Jan. 10, 2001.

Rodney L. Bean, Robert M. Steptoe, Jr., Steptoe & Johnson, Charleston, for Island Creek, Consol & Laurel Run.

Charles F. Donnelly, Donnelly & Carbone, Charleston, for Appellees.

PER CURIAM:

Through this appeal, Appellant Island Creek Coal Company ("Island Coal") seeks a reversal of the January 3, 2000, decision of the Circuit Court of Logan County finding it liable under the West Virginia Wage Payment and Protection Act ("Act"), West Virginia Code §§ 21–5–1 to –18 (1996), for two arbitration awards and one Mine Safety and Health Administration ("MSHA") award issued against Mutual Mining, Inc. ("Mutual Mining") in favor of Appellees John Taylor et

al.[1]  After examining this issue, we determine that the lower court was in error and accordingly, reverse.

### I.  Factual and Procedural Background

Mutual Mining, a contract miner for Island Creek Coal, laid off eighteen of its miners on June 7, 1995.  At the time of the layoff these miners were owed unpaid wages and benefits.  In an attempt to collect these wages and benefits, the miners filed a mechanic's lien on Island Creek's property on June 29, 1995.  They subsequently initiated an action in Logan County Circuit Court against both Mutual Mining[2] and Island Creek Coal. The action was filed under the Act[3] and also pursuant to the statutory provisions pertaining to the enforcement of mechanic's liens.[4]

Appellees alleged that Island Creek was the "prime contractor" and was therefore responsible for the payment of their wages and benefits under West Virginia Code § 21–5–7.[5]  In addition to seeking wages, the miners also sought recovery of amounts awarded to them in two separate arbitration proceedings and in an MSHA proceeding, all three of which were brought solely against Mutual Mining.  In a ruling dated November 14, 1997, the circuit court granted Appellees summary judgment based on its determination that Island Creek was the "prime contractor."  The court awarded Appellees "judgment . . . as to liability for actual damages consisting of wages and applicable fringe benefits together with prejudgment interest, costs, and reasonable attorneys' fees."  In its November 14, 1997, order, the lower court specifically left undetermined the actual amount of damages that Appellees

were to be paid.  Before any further order was entered specifying the amount of damages owed, this Court issued its decision in *Conrad v. Charles Town Races, Inc.,* 206 W.Va. 45, 521 S.E.2d 537 (1998).  Appellant argues here, as it did below, that *Conrad* fully resolves the issues presented in this case.

■  In *Conrad,* this Court was asked to determine whether a lower court correctly ruled that payments required under the federal WARN[6] Act (for failure to give workers a full sixty-day notice and wages prior to a plant closing) were not "wages" under the Act. Disregarding the rubric used in describing the WARN payments (back pay), we considered and adopted the reasoning of other courts on this issue—that such payments are viewed as damages awarded for violation of a legislative act and *not* compensation for past services.  Affirming the lower court's ruling, we held that the WARN payments were not "compensation for services rendered but [we]re damages designed to compensate employees for an employer's failure to provide the required sixty days' notice prior to [plant] closure."  206 W.Va. at 50, 521 S.E.2d at 542.

The circuit court, upon being apprised of the *Conrad* ruling, informed counsel that "I do not find it to have altered this decision." By order dated January 3, 2000, the lower court awarded to Appellees the amount of $519,681.94, plus interest.  Appellants do not challenge the portion of this amount which represents wages or fringe benefits owed to

---

1.  Appellees are coal miners that were formerly employed by Mutual Mining.

2.  The lower court entered a default judgment against Mutual Mining, who never appeared in the case.

3.  Appellees cite the following provisions of the Act in their complaint: W.Va.Code §§ 21–5–4(e), 21–5–7, and 21–5–12.

4.  The statutory provisions cited by Appellees for enforcement of their mechanic's liens are: W.Va. Code §§ 38–2–5, 38–2–6, 38–2–31, and 38–2–33 (1997).

5.  That provision requires that:

> Whenever any person, firm or corporation shall contract with another for the performance of any work which the prime contracting person has undertaken to perform for another, the prime contractor shall become civilly liable to employees engaged in the performance of work under such contract for the payment of wages and fringe benefits, exclusive of liquidated damages as provided in section four (e) of this article, to the extent that the employer of such employee fails to pay such wages and fringe benefits. . . .

W.Va.Code § 21–5–7.

6.  Worker Adjustment and Retraining Notification Act. *See* 29 U.S.C. §§ 2101–2109 (1988).

Appellees.[7] Instead, they challenge the inclusion of $279,291.12 based on the fact that this amount represents moneys that were either awarded through arbitration proceedings or as a result of an MSHA proceeding. Appellants contend that *Conrad* prohibits collection of these amounts under the Act since such amounts are more in the nature of a "damage" award, rather than payment for labor or services. *See* W.Va.Code § 21–5–1(c) (defining "wages" under the Act).

Given the differing facts underlying each of the three awards challenged by Appellants, we briefly set forth the particulars concerning the arbitration and MSHA awards at issue.

### A. Parkinson Award [8]

The Parkinson arbitration matter involved grievances filed to compel payment of graduated vacation pay (thirteen days worth) allegedly due Appellees under Article XIV of the National Bituminous Coal Wage Agreement of 1988 ("wage agreement"). The issue in this arbitration was whether Appellees, who had previously worked for Elm Mining [9] before being hired by Mutual Mining, were entitled to the graduated vacation pay benefit under the terms of the wage agreement. The proceeding involved application of the contractual concept of continuous employment. Based on his decision that Appellees did not have to be employed by the same company to come within this concept of continuous employment, the arbitrator determined that Appellees were entitled to the graduated vacation pay despite the change in employers from Elm Coal Company to Mutu-

al Mining. The amount of this award, entered against Mutual Mining, was $143,938.[10]

### B. Tanzman Award

The Tanzman arbitration matter involved a grievance filed by John Taylor in connection with his allegedly wrongful lay-off on December 22, 1992. At issue was whether Mutual Mining had violated the wage agreement by retaining another employee with less seniority. The arbitrator ruled in Mr. Taylor's favor,[11] based on the violation of the wage agreement, and awarded him reinstatement plus back pay in the amount of $27,775.39.

### C. MSHA Award

The MSHA award involved the discharge of five miners who were on the safety committee and had reported a number of serious safety violations. A federal ALJ determined that the five individuals had been illegally discharged by Mutual Mining and directed that they be reimbursed for their lost wages and benefits.[12] The total amount of this award was $105,577.73.

### II. Discussion

Appellants argue that each of the arbitration awards and the MSHA award fail to meet the statutory definition of "wages" and are therefore not recoverable under the Act. As defined by the Act,

[t]he term "wages" means compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation. As used in sections four, five, eight-a, ten and twelve of this

---

7. Appellants represented during oral argument (and Appellees did not dispute this representation) that all wages, interest, and liquidated damages owed under the lower court's ruling have been paid. With regard to the lower court's award of attorney's fees, Appellants stated that they had paid such fees up to the date of the filing of this appeal.

8. The two arbitration proceedings are referred to respectively as the Parkinson award and the Tanzman award, based on the surname of the arbitrator.

9. Appellees began working for Mutual Mining in 1989. Island Creek Coal first entered into a contract with Mutual Mining on December 18, 1988. The grievance concerning graduated vacation pay was filed on July 20, 1993, and the

arbitrator's decision was issued on October 28, 1994.

10. Despite Appellees' claim that Island Creek was a party to that proceeding, the grievance ruling indicates that the grievance was only filed against Mutual Mining. While the arbitration ruling indicates that two Island Creek employees appeared at the arbitration hearing on behalf of Mutual Mining, Island Creek explained during oral argument that these two employees were present because they were called as witnesses.

11. Both the federal district court and the court of appeals upheld this ruling.

12. The Fourth Circuit Court of Appeals affirmed this decision.

article, the term "wages" shall also include then accrued fringe benefits capable of calculation and payable directly to an employee: Provided, That nothing herein contained shall require fringe benefits to be calculated contrary to any agreement between an employer and his employees which does not contradict the provisions of this article.

W.Va.Code § 21–5–1(c). Analogizing to this Court's determination in *Conrad* that "the back pay remedy pursuant to the WARN Act is not compensation for labor or services rendered, as 'wages' are defined in the WCPA [Act], but a form of damages owed only in the event of an adjudication and finding of liability," Appellants argue that the arbitration and MSHA awards similarly qualify as damages rather than "wages." 206 W.Va. at 48, 521 S.E.2d at 540.

Like the circuit court, Appellees treat *Conrad* as inapposite authority,[13] and rely instead on a decision issued by the United States District Court in *Stump v. Cyprus Kanawha Corp.*, 919 F.Supp. 221 (S.D.W.Va. 1995). Appellees cite *Stump* for the proposition that arbitration awards can be enforced through the Act. Appellees' reliance on *Stump* was clearly misguided[14] for several reasons. In deciding that preemption under the Labor Management Relations Act was not required in *Stump*, the district court relied on *Albradco, Inc. v. Bevona*, 982 F.2d 82 (2nd Cir.1992). The New York statute being interpreted in *Albradco*, as Appellants note, is written in much broader terms than our Act. Rather than limiting recovery under the applicable statute to "wages," as our Act does, the New York statute encompasses "**all debts,** wages or salaries due and owing." *Id.* at 84 (quoting N.Y.B.C.L. § 630(a)) (emphasis supplied). Most critical, however, is the fact that both *Albradco* and *Stump* were concerned with the issue of preemption, under either ERISA or the Labor Management Relations Act. Thus, the issue of whether an arbitration award can be enforced through a wage payment and collections act was not directly under consideration. Rather than looking to the *Stump* decision, the lower court should have viewed *Conrad* as the controlling authority since that decision, unlike *Stump*, directly addressed what constitutes "wages" under the Act.

Notwithstanding its remedial purposes,[15] Appellants observe that the Act is clearly geared toward the collection of "wages." *See Farley v. Zapata Coal Corp.*, 167 W.Va. 630, 639, 281 S.E.2d 238, 244 (1981) (stating that "[b]oth the Wage Payment and Collection Act and our mechanics' lien statutes are designed to protect the laborer and act as an aid in the collection of *compensation* wrongfully withheld") (emphasis supplied). Emphasizing that the Act is not a collection mechanism for other types of debts for which alternate collection means are available, Appellants reason that, by permitting the Act to be used to collect debts other than those properly falling within its parameters, the Court would be fashioning a remedy that was not sanctioned by the Legislature and thereby wrongly subjecting entities to the punitive penalties associated with the Act's violation, such as liquidated damages and attorney's fees.[16] *See* W.Va.Code §§ 21–5–4(e); 21–5–12(b).

---

**13.** We are unpersuaded by Appellees' attempt to distinguish *Conrad,* and our more recent decision in *Rowe v. Grapevine*, 206 W.Va. 703, 527 S.E.2d 814 (1999), applying *Conrad*, on the grounds that those two decisions involved liquidated damages in contrast to this decision where liquidated damages were not awarded in conjunction with the arbitration and MSHA awards. This distinction has no bearing on the applicability of this Court's ruling in *Conrad.*

**14.** It is one thing for the court in *Stump* to say that "the Albradco decision from the Second Circuit indicates that one can enforce an arbitration decision based upon a state's wage payment and collection act and receive liquidated damages pursuant to the state act regardless of a collective bargaining agreement," and the Appellees to say that *Stump* stands for the proposition that arbitration awards can be properly enforced/collected through the Wage Payment and Collection Act. 919 F.Supp. at 225.

**15.** *See* Syl. Pt. 3, *Jones v. Tri–County Growers, Inc.*, 179 W.Va. 218, 366 S.E.2d 726 (1988) (stating that "[t]he West Virginia Wage Payment and Collection Act is remedial legislation designed to protect working people in a system in the collection of compensation wrongly withheld").

**16.** The Act does not hold a prime contractor responsible for liquidated damages. W.Va.Code § 21–5–7.

■ Both the MSHA award and the Tanzman award easily fall within the reaches of our *Conrad* decision. In each of those matters, the remedy fashioned was an award of back pay. Such amounts, just as in *Conrad,* were awarded not for "labor or services rendered," but instead as a form of damages for violation of the collective bargaining agreement. We were clear in *Conrad* that amounts awarded as a form of damages do not qualify as "wages" under the Act. *See* 206 W.Va. at 50, 521 S.E.2d at 542.

■ Less clear, however, is the Parkinson award, which concerned the award of graduated vacation pay. Appellees properly characterize graduated vacation pay as fringe benefits. *See* W.Va.Code § 21–5–1(*l*). Given the inclusion of fringe benefits within the definition of "wages," Appellees summarily conclude that the award of graduated vacation pay is necessarily an amount they can recover under the Act. *See* W.Va.Code §§ 21–5–1(c), (*l*). Despite the inclusion of fringe benefits within the definition of wages, Appellants point out that the graduated vacation pay at issue in the arbitration award was not "earned" by Appellees in connection with their work for Mutual Mining. *See* W.Va. Code § 21–5–1(c). Instead, it was a form of pay to which the terms of the wage agreement entitled them based on their previous years of employment with Elm Coal Company. Appellants argue that because the Parkinson award only resulted through "an adjudication and finding of liability," it is "a form of damage" that falls outside the reach of the Act. *See Conrad,* 206 W.Va. at 48, 521 S.E.2d at 540.

If this award of graduated vacation pay had first accrued [17] during the period when Appellees were employed by Mutual Mining, rather than when they were employed by Elm Coal Company, we would be more willing to consider that vacation pay as having been "earned" rather than being awarded as a form of damages as a direct result of legal proceedings under the rationale of *Conrad. See* 206 W.Va. at 48, 521 S.E.2d at 540. Under the facts presented, we find the graduated vacation pay awarded by the arbitrator in the Parkinson matter to be more akin to an award of damages than to an award of "wages," as that term is defined by the Act. *See* W.Va.Code § 21–5–1(c); *Conrad,* 206 W.Va. at 50, 521 S.E.2d at 542.

Based on the foregoing, we reverse the decision of the Circuit Court of Logan County.

Reversed.

Justice STARCHER dissents and files a dissenting Opinion in which Justice McGRAW joins.

STARCHER, Justice, dissenting.

(Filed Jan. 10, 2001)

I dissent to the majority opinion's refusal to allow the plaintiffs a remedy under the Wage Payment and Collection Act ("the Act"), so that they may collect wages and fringe benefits that their employer refused to pay.

The Act, specifically *W.Va.Code,* 21–5–1(c), defines "wages" as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation." [1] Under this statute, the employer and employee can "agree" on a way to calculate wages (*e.g.,* $5.25 in cash per hour worked). Once the employee performs and provides services or labor, then the employer must respond and compensate the employee pursuant to the "contract."

*W.Va.Code,* 21–5–1(c) specifically says that the term "wages" "shall also include then accrued fringe benefits capable of calcula-

---

17. *See* W.Va.Code § 21–5–1(c) (including within statutory definition of "wages" "then accrued fringe benefits capable of calculation").

1. *W.Va.Code,* 21–5–1(c) defines "wages" in the following way:
   (c) The term "wages" means compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calcu-

lation.... [T]he term "wages" shall also include then accrued fringe benefits capable of calculation and payable directly to an employee: Provided, That nothing herein contained shall require fringe benefits to be calculated contrary to any agreement between an employer and his employees which does not contradict the provisions of this article.

**38**

tion and payable directly to an employee[.]" A "fringe benefit" includes such things as vacation, holidays, sick leave, or production bonuses. *W.Va.Code*, 21–5–1(1).[2] Hence, under the statute, an employer and an employee can also "agree" on a way to calculate fringe benefits that are payable just like wages (*e.g.*, 1.5 days of sick leave for each month worked). Again, once the employee performs and provides services or labor, then the employer must respond and compensate the employee with the fringe benefit pursuant to the means of calculation set forth in the "contract."

The statute says that wages include fringe benefits "capable of calculation" and "payable directly to an employee." "Calculate" means to "ascertain or determine beforehand, esp. by arithmetic," while "payable" means "due ... owed, owing, outstanding, unpaid, receivable." *Oxford Desk Dictionary and Thesaurus, American Edition* (1997).

Hence, the term "wages" in *W.Va.Code*, 21–5–1(c) includes vacation and sick leave that can be arithmetically determined before services are rendered by the employee, and which are due, owing, and as yet unpaid to an employee who has provided services. These fringe benefits became part of the plaintiff-employees' overall compensation earned during their periods of employment.

There is nothing in the Wage Payment and Collection Act that requires an employer to offer fringe benefits. Nothing in the Act compels an employer to give his employees time off for vacation, or for holidays, or for sick leave. Employers choose to offer fringe benefits because it appeals to employees, and makes the job more enticing.

But, once an employer makes the choice to offer a fringe benefit, then *W.Va.Code*, 21–5–1(c) takes over and ensures that if the employee performs the specified work in expectation of receiving the fringe benefit, then the employer may not make the earned benefit illusory.

The instant case contains repeated instances where the employer offered wages and fringe benefits as part of a wage package to its employees, and the employees showed up for work expecting to receive the wages and fringe benefits. After the employees performed their part of the bargain—after the wages and fringe benefits became due and "payable directly to an employee"—the employer reneged on the bargain and refused to pay.

For example, in the Parkinson arbitration matter, the appellees showed up for work and, as part of their wages, were to receive vacation pay. The employers, who received a benefit from the appellees' labor, refused to pay the wages due and owing. Under the Wage Payment and Collection Act, the unpaid vacation pay constituted wages, and the Act provides a mechanism for the collection of those unpaid wages. Similarly, in the Tanzman arbitration award, the employees were promised a daily wage for showing up to work and being retained at the job on the basis of seniority. The employee at issue, John Taylor, lived up to his end of the bargain. The employer laid him off in favor of a less senior employee and deprived him of his daily wage, a wage that was subsequently ordered to be paid by an arbitrator.

Each employee in this consolidated case rendered services to the employer expecting to receive agreed-upon wages, wages that are required to be paid under the Wage Payment and Collection Act. Each employee was wrongfully denied his wages, and was forced to resort to legal action to collect those wages.

The majority opinion unfairly denies the employees their right to a remedy under the Wage Payment and Collection Act. I therefore respectfully dissent.

I am authorized to state that Justice McGRAW joins in this dissent.

---

**2.** *W.Va.Code*, 21–1–5(1) defines "fringe benefits" in the following manner:

(1) The term "fringe benefits" means any benefit provided an employee or group of employees by an employer, or which is required by law, and includes regular vacation, graduated vacation, floating vacation, holidays, sick leave, personal leave, production incentive bonuses, sickness and accident benefits and benefits relating to medical and pension coverage.